UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

APRIL RACHEL SCHILLING,

Plaintiff,

v.

Commissioner of Social Security,

Defendant.

No. 1:22-cv-01521-GSA

**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF**

**(Doc. 16, 19)**

## I.     Introduction

Plaintiff April Rachel Schilling ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income benefits pursuant to Title XVI of the Social Security Act.  The matter is before the Court on the parties' briefs.[1]  Docs. 16, 19, 20.  After reviewing the record the Court finds that substantial evidence and applicable law support the ALJ's decision.

## II.     Factual and Procedural Background[2]

Plaintiff applied for supplemental security income on September 23, 2014.  AR 218–23.  On July 20, 2017 the Commissioner found Plaintiff was disabled as of September 23, 2014.  AR 90–99.  On May 22, 2019, following a Continuing Disability Review (CDR) pursuant to 20 C.F.R. § 416.989, the Commissioner found that Plaintiff was no longer disabled as of May 15, 2019. AR 122–24.  That determination was upheld on reconsideration on October 31, 2019.  AR 136–46, 147–49.  Two hearings were held before an Administrative Law Judge (the "ALJ") on February 9,

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge.  *See* Docs. 11 and 12.

[2] The Court has reviewed the relevant portions of the administrative record including the medical, opinion, and testimonial evidence about which the parties are well informed.  It will not be exhaustively summarized.  Relevant portions will be referenced in the course of the analysis below when pertinent to the parties' arguments.

2021 and June 29, 2021, respectively.  AR 64–79; 41–63.  On August 27, 2021 the ALJ issued an unfavorable decision.  AR 17–40.  The Appeals Council denied review on August 29, 2022.  AR 10–15.  On November 23, 2022, Plaintiff filed a complaint in this Court.

### III.    Disability Standard Generally

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.    "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted).  If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.    42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.
>
> 42 U.S.C. §1382c(a)(3)(B).

## IV.    Continuing Disability Review

After finding a claimant disabled, the agency must conduct a continuing disability review "from time to time."  20 C.F.R. § 416.989; 42 U.S.C. § 1382c(a)(3)(H)).  Continuing disability is not presumed; rather, the claimant must establish it.  42 U.S.C. § 1382c(a)(4); *see also Lambert v. Saul*, 980 F.3d 1266, 1275-76 (9th Cir. 2020).  To find a claimant no longer disabled, substantial evidence must show cessation of the previously disabling impairment or medical improvement which renders the claimant able to perform substantial gainful activity. *Id.*

The inquiry is governed by a seven step analysis.  At step one, the ALJ must determine whether the claimant has an impairment or combination of impairments which meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CRF 416.920(d), 416.925 and 416.926).  If the claimant does, her disability continues (20 CFR 416.994(b)(5)(i)).

At step two, the ALJ must determine whether medical improvement has occurred (20 CFR 416.994(b)(5)(ii)).  Medical improvement is any decrease in medical severity of the impairment(s) as established by improvement in symptoms, signs and/or laboratory findings (20 CFR 416.994(b)(1)(i)).  If medical improvement has occurred, the analysis proceeds to the third step. If not, the analysis proceeds to the fourth step.

At step three, the ALJ must determine whether medical improvement is related to the ability to work (20 CFR 416.994(b)(5)(iii)).  Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities (20 CFR 416.994(b)(1)(iii)).  If it does, the analysis proceeds to the fifth step.

At step four, the ALJ must determine if an exception to medical improvement applies (20 CFR 416.994(b)(5)(iv)).  There are two groups of exceptions (20 CFR 416.994(b)(3) and (b)(4)).  If a first group exceptions applies, the analysis proceeds to the next step.  If a second group exceptions applies, the claimant's disability ends.  If none apply, the claimant's disability continues.

At step five, the ALJ must determine whether all the claimant's current impairments in combination are severe (20 CFR 416.994(b)(5)(v)).  If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant is no longer

disabled.  If they do, the analysis proceeds to the sixth step.

At step six, the ALJ must assess the claimant's residual functional capacity based on the current impairments and determine if she can perform past relevant work (20 CFR 416.994(b)(5)(vi)).  If the claimant has the capacity to perform past relevant work her disability has ended.  If not, the analysis proceeds to the last step.

At step seven, the ALJ must determine whether other work exists that the claimant can perform given her residual functional capacity and considering her age, education, and past work experience (20 CFR 416.994(b)(5)(vii)).  If the claimant can perform other work, she is no longer disabled. If the claimant cannot perform other work, her disability continues.

## V.    The ALJ's Decision

The ALJ noted that the prior disability determination was based on the finding that Plaintiff met Listing 13.10 due to breast cancer status-post multiple surgeries with complications and ongoing infections.  AR 22.  The ALJ found that since May 15, 2019, Plaintiff no longer met that listing as the cancer was in remission and testing of her breast tumor was benign.  AR 24–25.  The ALJ found that since May 15, 2019, Plaintiff had severe impairments of breast malignant neoplasm status-post mastectomy, cellulitis of the right hand, cervical spondylosis, and (most notably for the purposes of this appeal) generalized anxiety disorder and major depressive disorder.  AR 22, 25.

The ALJ found Plaintiff had the RFC to perform light work as defined in 20 C.F.R. 416.967(b) with exertional, postural, and environmental restrictions not at issue, and only routine repetitive tasks with simple decision-making.  AR 26.  The ALJ further found Plaintiff did not have any past relevant work. AR 31.  Based on the VE's testimony the ALJ concluded that other jobs existed in significant numbers in the national economy that Plaintiff could perform, namely: bakery worker, conveyor line, parking lot attendant, and office helper.  AR 32–33.  Accordingly, the ALJ found that Plaintiff was no longer disabled as of May 15, 2019, and thereafter.  AR 33.

## VI.    Issues Presented

Plaintiff asserts two claims of error: 1) the ALJ improperly discounted the opinion of her treating psychiatric nurse practitioner, NP Connery; and 2) the ALJ improperly discounted Plaintiff's subjective testimony.

4

A. **The Medical Opinion Evidence**

1. **Applicable Law**

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity. *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018). The RFC is "the most you can still do despite your limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). The RFC need not mirror a particular opinion; it is an assessment formulated by the ALJ based on all relevant evidence. *See* 20 C.F.R. §§ 404.1545(a)(3).

For applications filed on or after March 27, 2017, the new regulations eliminate a hierarchy of medical opinions, and provide that "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, when evaluating any medical opinion, the regulations provide that the ALJ will consider the factors of supportability, consistency, treatment relationship, specialization, and other factors. 20 C.F.R. § 404.1520c(c). Supportability and consistency are the two most important factors and the agency will articulate

how the factors of supportability and consistency are considered. *Id.*

On April 22, 2022, the Ninth Circuit addressed whether the specific and legitimate reasoning standard is consistent with the revised regulations, stating as follows:

> The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant. See 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) ..., including those from your medical sources."). Our requirement that ALJs provide "specific and legitimate reasons" for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions, see Murray, 722 F.2d at 501–02, is likewise incompatible with the revised regulations. Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.

*Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022)

### 2.   **Analysis**

Plaintiff's first  claim of error is but one point within a broader argument about the extent to which the mental RFC is supported by substantial evidence.  Plaintiff raises numerous other arguments about the supportability of the ALJ's reasoning and arguments which do not directly address NP Connery's opinion.  Thus, those arguments will be analyzed separately.

### a.   **Whether NP Connery's Note Was a Functional Opinion or Statement on the Ultimate Issue of Disability**

The ALJ provided the following discussion regarding NP Connery's treatment note that Plaintiff is limited to part time work with support:

> Similarly, the claimant's mental health treatment providers opined that the claimant had a "moderate" disability and could work with support or part time depending on the claimant's reported symptoms at the time of her appointment (B20F; B22F; ). Decisions by governmental agencies, decisions by non-governmental entities, and statements on issues reserved to the Commissioner are inherently neither valuable nor persuasive. In accordance with 20 CFR 404.1520b(c) and 416.920b(c), no articulation has been provided about evidence of this nature.

Defendant contends NP Connery's statement that Plaintiff can perform part-time work with support is a conclusion on the ultimate issues of disability.  Defendant contends it does not meet

the regulatory definition of a medical opinion because it is not a statement concerning a claimant's "ability to perform mental demands of work activities such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervisors, co-workers, or work pressures in a work setting." Resp. at 9 (Doc. 18) (citing 20 C.F.R. 416.913(a)(2). Plaintiff disagrees:

> The opinion that Schilling could sustain part-time work activity has no functional difference than an opinion that a person could lift and carry 20 pounds occasionally, up to a third of the day. The opinion that Schilling would need additional support in a work setting is a classic statement of limitation. The ability to perform any kind of work includes the ability to sustain an ordinary routine without special supervision, i.e., support. POMS DI 25020.010 §§ B.2, sixth bullet, B.3.f
>
> The ability to sustain work activity for a full-time schedule is the core of medical opinion that reflects on an assessment by the ALJ of residual functional capacity. The Commissioner gives an incomplete list of the opinion evidence for mental demands of work. ("such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting"). A "such as" statement has a built in ambiguity necessarily filled in by the subregulatory expansion of that list by POMS.
>
> Connery's opinions go to the heart of a medical source statement as defined and explained by POMS. The Court should respect the descriptions in POMS if not outright defer to that explanation. Connery's statements are consistent with the multi-factored abnormalities described in the mental status examinations stretching form before the cessation date to well-after that May 2019 date. The Court should credit the opinions of Nurse Connery as true. The Court should reverse and award benefits because a person limited to part-time work cannot engage in substantial gainful activity at step seven (ordinarily step five) of the sequential evaluation process

Br. at 9 (Doc. 16) (citations omitted).

A medical opinion addresses the "ability to perform the physical [or mental] demands of work activity." 20 C.F.R. § 416.913(a)(2)(i). The examples of physical work activity (sitting, standing, walking, lifting) are descriptive action verbs that require no interpretation. The examples of mental work activity, however, (understanding, applying, sustaining) are less concrete and more abstract.

Further. as Plaintiff emphasizes, the regulations give a non-exhaustive list of examples of

physical or mental work activity ("such as . . ."). However, as for Plaintiff's contention that this non-exhaustive list is "necessarily filled in by the subregulatory expansion of that list by POMS" (the agency's field guide), which the Court should respect "if not outright defer to," is not convincing. It is refuted by controlling authority which holds that agency policy set forth in the Program Operations Manual System ("POMS") "does not impose judicially enforceable duties on either [the] court or the ALJ." *Carillo-Yeras*, 671 F.3d 731, 735 (9th Cir. 2011).

Although POMS imposes no enforceable duties on the ALJ or the Court, the Court <u>may</u> nevertheless consider the same. *See Id.* Under the category of "understanding, remembering, and applying information,"[3] POMS lists eight examples of mental work activities including: 1) the ability to "maintain regular attendance"; and 2) "the ability to sustain an ordinary routine without special supervision." These conceivably relate to NP Connery's notation that Plaintiff can work part time and requires support to do so.

As to attendance limitations in particular, there simply is no practical way to incorporate them into an RFC. In contrast to other "work activities" identified in POMS, the ability to "maintain attendance" cannot be modified in any meaningful way to accommodate a claimant's mental impairments. If the claimant cannot maintain attendance within customary tolerances, the claimant simply cannot work. Indeed, Plaintiff posits no theory as to how to incorporate such a limitation into the RFC on remand. Rather, Plaintiff contends "The Court should reverse and award benefits because a person limited to part-time work cannot engage in substantial gainful activity."

However, Plaintiff does not cite a case where a court remanded for an award of benefits based on a statement from a clinician that the claimant can only work part time. Even if the ALJ erred in dispensing with NP Connery's "opinion" on the basis that it was merely a conclusion on the ultimate issue of disability, the ALJ's opinion as a whole provides sufficient reasoning to reject

---

[3] POMS DI 25020.010 §§ B.2, sixth bullet, B.3.f, https://secure.ssa.gov/poms.nsf/lnx/0425020010

the limitation to part time work.

Further, there is no reason here to focus on the alleged limitation concerning part time work at the expense of the extensive surrounding treatment notes, many of which contain material more closely resembling a functional opinion.  Ex. B20F, B22F (AR 697–794; 811–848).

The Kern Behavioral Health Records (largely completed by NP Connery) reflect several progress notes containing a section entitled "Life Functioning Area: Impairment Due to a Mental Disorder (or at times entitled "Current Impairment Due to Mental Health Symptoms").  The functions evaluated were: Independent Living; Social Relationships; Vocation/Education; Physical Care-- all of which are evaluated on a five point spectrum (none, mild, moderate, severe, extreme).[4]

On one occasion, NP Connery identified mild impairments as to independent living and physical care.  AR 741.  On another occasion, NP Connery checked "mild" as to social relationship impairments  (AR 707), and "mild" as to independent living impairments (AR 708).   NP Connery noted some "moderate" impairments, namely as to vocation/education/meaningful activity (AR 709, 741) The moderate impairment, however, was predicated on the claimant's subjective reports, not on NP Connery's independent observations: "Client fears having to return to work. 'I get paranoid. I hyperventilate.' She stated she doesn't believe she can return to work. Client is not enjoying even her 'beading.' Great difficulty with concentration and memory."  AR 709.

Similarly, when NP Connery upgraded Plaintiff's social relationships impairment from mild to moderate, it was predicated on Plaintiff's statement that she spends time with nobody but her aunt and boyfriend, has only one other friend who she hasn't seen in a year and often has panic attacks in public requiring her to go home.  AR 740-41.

---

[4] As compared to the notation concerning part time work, this additional material more closely resembles the four areas of mental functioning the Commissioner considers in the psychiatric review technique or PRT, i.e. the "paragraph B" criteria (e.g., understanding/remembering/applying information; social interaction; concentration/persistence/pace, etc), which the Commissioner similarly evaluates on five point spectrum (none, mild, moderate, marked, extreme).

In that respect the assessment was susceptible to the ALJ's critique of the same, namely that NP Connery's assessment was dependent upon the symptoms the claimant reported at the encounter.  AR 31.

In sum, Plaintiff's request for an award of benefits based on NP Connery's assessment that she is limited to part time work with support, has no merit despite the fact that the ALJ was perhaps unjustified in characterizing that assessment as an impermissible conclusion on the ultimate issue of disability.  NP Connery's more detailed functional assessments in the Kern Behavioral Health records do not lend strong support to the notion that Plaintiff was limited to part time work with support.  Rather, it identified mild to moderate limitations.  Additionally, where it identified moderate limitations, there was no articulated basis for the assessment based on anything NP Connery independently observed, as opposed to a recitation of the Plaintiff's symptoms, experiences and concerns in response to which NP Connery often changed the assessments (which the ALJ alluded to), such as by upgrading the social relationships impairment from mild to moderate.

Further, the ALJ provided additional discussion related to the mental RFC assessment (discussion equally applicable to the rejection of NP Connery's assessment) which is discussed in more detail below to the extent Plaintiff disputes the same.  It included: 1) reasoning for finding no more than mild to moderate limitations in the four categories of mental functioning considered in performing the PRT (the "paragraph B criteria") (AR 23-24); 2) discussion of Plaintiff's symptom allegations concerning panic attacks, agoraphobia, memory and concentration problem (AR 26); 3) affirmative reasoning in support of the RFC including canvassing the mental health treatment records, corresponding mental status examinations and cognitive testing; and (AR 29); 4) the results of the consultative psychiatric examination, the associated functional opinion, and the opinions of third parties (her mother and friend) and the persuasiveness (or lack thereof) of those opinions (AR

29-31).

### b.    Whether the ALJ used the Wrong Standard

Plaintiff further explains in reply as follows:

> The Commissioner's citation of 20 C.F.R. § 416.913(a)(2) discloses that the ALJ used the wrong standard in all aspects of this case. The ALJ should have used 20 C.F.R. § 416.927 but did not. The use of the wrong standard revealed by the Commissioner's argument requires a remand to use the weight standard, not the consistency and supportability standard. Social Security Ruling 96-6p (applicable to claims filed before March 27, 2017).
> Even if the standards found in 20 C.F.R. §§ 416.927b, 416.927c do apply, it is clear that the nurse practitioner is an acceptable medical source. 20 C.F.R. § 416.902(a)(7).

Reply at 4 (Doc. 20)

Initially it is to be noted that this argument was not preserved in Plaintiff's opening brief. The argument is also not clear.  Neither Defendant nor the ALJ suggested NP Connery was not an acceptable medical source.  Further, Plaintiff's reference to the "weight standard" as opposed to the "consistency and supportability standard" is a reference to the now defunct treating physician rule, which has no bearing on the issue of acceptable medical sources vs. other sources.

In any event, the argument is not persuasive.  As cited and explained above, the revised regulations apply for claims filed on or after March 27, 2017, and require ALJs to evaluate all opinions using the factors of supportability and consistency (the two factors requiring articulation), treatment relationship, and others.  There is no opinion hierarchy and ALJs are not to assign any particular weight to any medical opinion (greater weight was previously given to treating source opinions (the "treating physician rule")).

Here we have a unique situation, and it is not clear which regulation should apply.  The ALJ applied the revised regulations applicable to claims filed on or after March 27, 2017.  But technically Plaintiff's underlying claim was in fact filed on September 23, 2014, and granted on July 20, 2017, based on Plaintiff meeting the listing for breast cancer.  On May 22, 2019, following

a continuing disability review, the Commissioner found that Plaintiff was no longer disabled as of May 15, 2019, in that she no longer met that listing as her breast cancer was in remission and her tumors were benign.   The ALJ, however, found Plaintiff nevertheless suffered from other impairments, including the mental health impairments which are the subject of this appeal.   Thus, the analysis here is functionally no different than if the claimant had never applied for SSI in 2014, and had filed for SSI for the first time on the date of her breast cancer cessation on May 15, 2019, in which case the revised regulations would apply with the less deferential standard.

Even though it may be unclear as to what the operative date of the application should be as it relates to the application of the treating physician rule, the distinction between the two sets of regulations is more useful in theory than in practice, particularly where, as here, the treating source "opinion" in question is two check boxes[5] noting Plaintiff can perform part time work with support, contained within 100+ pages of other clinical evidence supporting a different inference.

Where a treating physician completes one of the agency's detailed RFC questionnaires, or provides a similar narrative report addressing functional capacities with supporting clinical findings, the prior regulations would mandate the opinion be credited as true, or require the ALJ to comply with a heightened standard of articulation if the ALJ decides to reject it (specific and legitimate reasons).   In contrast. the inquiry in the revised regulations would be a bit more nuanced, less deferential to the treating source and no heightened standard would apply to the ALJ's articulation of the weight assigned to the opinion. However, this distinction would not change the outcome here as it relates to NP Connery's two check boxes, unaccompanied by explanation, and the opinion would not be appropriately credited as true under either version of the regulations.

---

[5] Which is not intended to lend any support to the ALJs' common critique of check-box format opinions, when in fact the agency publishes its own check-box questionnaires for medical sources to complete.  *See* https://omb.report/omb/0960-0662 (SSA uses Forms HA-1151 and HA-1152 to collect data that is required to determine the residual functional capacity (RFC) . . .  respondents are medical sources paid by SSA to provide reports based either on existing medical evidence or on consultative examinations conducted for the purposes of the report).

### c.   Psychiatric Consultative Exam

Dr. Gresham performed a consultative psychiatric examination at the request of the agency on April 20, 2019.  AR 447.  The results of the mental status examination portion were as follows:

- General Appearance: hygiene and grooming WNL (within normal limits)
- Attitude/Behavior: pleasant and cooperative; appropriate behavior; eye contact WNL; no psychomotor agitation or retardation.
- Stream of Mental Activity/Speech: thought process was linear, logical, and goal oriented; organized and coherent; speech was normal in volume, rate, and tone; no impairments in receptive or expressive language.
- Thought Content: no suicidal or homicidal ideation; denied auditory or visual hallucinations; no delusions; thought content WNL
- Mood/Affect: anxious presentation; affect congruent with mood; subjective mood was irritated and tense.

Intellectual Functioning/Sensorium testing appeared to reflect some deficiencies, though the functional significance of those deficiencies is not apparent.  Dr. Gresham noted diagnoses of general anxiety disorder, persistent depressive disorder, and stated Plaintiff's prognosis was fair. AR 447.  As to functionality, Dr. Gresham opined that Plaintiff was mildly impaired in her ability to: 1) maintain attendance and complete a normal workday/workweek without interruptions from a psychiatric condition; and 2) ability to deal with the usual stress encountered in the workplace.  AR 447. Dr. Gresham further opined that Plaintiff was unimpaired in all other respects (perform simple and repetitive tasks; perform detailed and complex tasks; accept instructions from supervisors; interact with coworkers and the public; and, perform work activities on a consistent basis without special or additional instruction).  *Id.*

The ALJ addressed the opinion as follows:

> The undersigned finds Dr. Gresham's opinion not persuasive. Dr. Gresham supported her opinion with her exam and the claimant's own subjective complaints. The evidence of the claimant's grossly normal mental status exams is inconsistent with Dr. Gresham's opinion. For example, the claimant was independent in her self-care and could do some household chores, which is inconsistent with finding she could not fulfill a normal workday/workweek. For this reason, the undersigned finds Dr. Gresham's opinion not persuasive.

13

AR 30

The ALJ's discussion here somewhat misses the point considering Dr. Gresham's opinion in fact *supported* the ALJ's findings, did not identify any more stringent limitations than the ALJ did, and did not opine "she could not fulfill a normal workday/workweek" (only a mild impairment in that respect). Non-responsive as it may be, the ALJ's discussion is not prejudicial to the claimant as the opinion does not identify a work preclusive limitation, nor does Plaintiff contend otherwise. The ALJ's discussion does however suggest that the ALJ simply did not thoroughly read or understand the opinion. Otherwise, it is not clear why the ALJ would reject an opinion that Plaintiff had no more than mild mental limitations in any area of mental functioning.

Plaintiff's only related critique is that Dr. Gresham's findings concerning concentration/persistence/pace being within normal limits was predicated in part on a finding that Plaintiff was able to perform "serial 5s" without issue. Plaintiff explains that:

> This party is unaware of the use of serial 5s as a test for concentration in any iteration of the assessment of mental impairments. The Commissioner formerly described serial 3s and 7s as a test for concentration but never 5s. No serial test is mentioned in the regulations in effect for this claim. 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00.

Br. at 7, Doc. 16.

Indeed, a google search reveals no responsive hits for "serial 5s." The correct cognitive test is serial 7s or serial 3s (counting back from 100 by 7s or 3s.). It is apparent that counting back from 100 by 7s (93, 86, 79, etc . . .) or counting by 3s (97, 94, 91, 88 etc) is more cognitively demanding and requires more concentration than counting back from 100 by 5 (95, 90, 85, 80, 75, 70).

However, given there is no dispute Dr. Gresham is a qualified clinical psychologist who is presumably aware of the correct test, given (as Plaintiff observes) there is no reference to serial 5s in any iteration of the assessment of mental impairments, and given there are zero responsive hits for a google search for serial 5s, the only reasonable conclusion is that Dr. Gresham's reference to

serial 5s was a typo.  And, even if not, Plaintiff does not overtly contend remand is warranted for performance of the correct test, but merely observes in passing that serial 5s is not in fact the correct test.  It would otherwise be a stretch  to suggest that this mistake alone undermined Dr. Gresham's global functional assessment which identified no more than mild limitations in any area of mental functioning (an assessment based on a detailed mental status examination and cognitive testing, not just based on "serial 5s.").

### d.     <u>"Grossly Normal" Mental Status Examinations</u>

Plaintiff disputes the ALJ's characterization of the mental status examinations of record, explaining as follows:

> The ALJ stated that Schilling had "grossly normal" mental status examinations. AR 28.The ALJ picked one mental status examination for the proposition that Schilling had normal mood and affect. *Id.* (citing AR 392). That assessment bears the date of August 2018. AR 392. It stands in contrast to the assessment abutting and after the cessation of disability in May 2019. AR 401 (November 2018), 446 (April 2019), 468 (June 2019), 723 (October 2019), 732 (February 2020), 891 (June 2020).

Br. at 7-8.

As to the functional implications of anxious mood and affect, which Plaintiff suggests supports a more limiting mental RFC, the inference is not supported.  The April 2019 examination was the consultative examination with Dr. Gresham discussed above.  In addition to anxious mood and affect, Dr. Gresham identified other abnormalities (able to spell "world" forward but not backward; 6 digit recall forward but only 3 backward; recalled 1 of 3 objects after 5 minutes; unable to discuss current events).  Dr. Gresham also identified various findings that were normal, or stated as such ("WNL," i.e. within normal limits).

In consideration of this mix of normal and abnormal findings upon mental status examination, Dr. Gresham nevertheless opined that Plaintiff had no more than mild limitations in any area of mental functioning.  AR 447.  Thus, the fact that Dr. Gresham's examination serves as an exception to the ALJ's observation about normal mood and affect does not support more

restrictive mental functional limitations than what Dr. Gresham identified in the opinion. Dr. Gresham would be the authority on the functional significance of the examination findings he documented.

Further, Plaintiff's argument as quoted above began by questioning the ALJ's generalization about "grossly normal" mental status examinations. Mood/affect was but one of ten exemplary findings the ALJ cited as indicative of "grossly normal" mental status examinations, including: 1) she was able to recall detailed autobiographical and historical information (B6F/4); 2) she was oriented in all spheres (B2F/13); 3) her thought process was normal, linear, logical, and goal oriented (B4F/5; B6F/4); 4) she had a normal mood and affect (B2F/14); 5) she was pleasant and cooperative with examiners (B6F/4);6) her eye contact was within normal limits (B6F/4); 7) concentration, persistence, and pace WNL (B6F/3); 8) she performed serial 5s[6] and simple calculations without issue (B6F/4); 9) she managed her personal care and some household chores (B6F/3); and, 10) her hygiene and grooming were within normal limits (Ex. B6F/3). AR 28–29.

Plaintiff provides additional discussion of clinical evidence, a discussion easier to quote in full rather than paraphrase:

> Nor are Schilling's mental status examinations *normal*. Schilling was agitated, anxious, and sad (AR 712); had a restricted range of affect and pressured speech (AR 714); had fair remote memory and insight (AR 715); was agitated, anxious, and depressed (AR 723); had fair remote memory and insight (AR 726); was depressed and sad (AR 732); reported marginal sleep and appetite with a depressed, dysphoric, and sad mood (AR 733). These findings are not largely or mostly normal and are consistent with and support the limitations to part-time work activity with the provision of support. AR 738. Schilling continued to need cognitive behavioral therapy and coping skills. AR 739.
> Other mental status examinations described Schilling as agitated, depressed, overwhelmed, and sad (AR 747); fair remote and long-term memory (AR 750); worried and anxious (AR 756). NP Connery Lee continued to diagnose generalized anxiety disorder and persistent depressive disorder starting in June 2019. AR 762. NP Connery Lee repeated the assessment that Schilling could sustain part-time work activity with support. AR 762. Schilling continued to have an anxious and worried mood (AR 765, 766). NP Connery Lee repeated the assessment that Schilling could

---

[6] Granted, the ALJ was reciting Dr. Gresham's erroneous reference to "serial 5s."

sustain part-time work activity with support. AR 771. Schilling agreed to take Paxil as a substitute for Wellbutrin because of agitation and continued to take Buspar. AR 772, 774, 820. Schilling had marginal sleep. AR 775. Nurse practitioner Connery Lee repeated the assessment that Schilling could sustain part-time work activity with support with a fair prognosis. AR 781. Schilling had an anxious and worried mood with marginal sleep. AR 785, 786. NP Connery Lee repeated the assessment that Schilling could sustain part-time work activity with support with a fair prognosis. AR 790. The clinic discontinued Vistaril and refilled both Buspar and Paxil. AR 793. Schilling expressed ongoing concerns about depression and triggers for her depression. AR 812, 815, 818. The need for a break to listen to music, reading, or playing with a pet dog are not consistent with the sustained requirements of work. Garrison v. Colvin, 759 F.3d 995, 1016 (9th Cir. 2014). Planning chores around feelings of being less overwhelmed to reduce depression are inconsistent with sustained competitive employment. AR 815.

Dr. Gresham observed Schilling as anxious with a congruent mood; able to recall three digits backwards; able to recall one of three objects after one and five minutes; and unable to discuss current events; and unable to spell world backwards. AR 445–46. These independent findings support the presence of limitations described by NP Connery Lee. The presence of an anxious mood, able to recall just three digits backwards, and the inability to spell world backwards are not in the normal range. The ALJ did not state reasons supported by substantial evidence to reject the imposition of a restriction to part-time work activity with the presence of support under 20 C.F.R. § 416.920c(c); Woods v. Kijakazi, 32 F.4th 785, 792 (9th Cir. 2022).

This discussion was provided for the first time in Plaintiff's reply brief. Although the discussion broke new ground in some respects, Plaintiff again extensively recited previous findings noting that Plaintiff's mood/affect were some combination of agitated, anxious, sad, and depressed. The reply brief further notes additional instances in which NP Connery repeated the assessment concerning part time work with support, and additional details about those records including the well-documented mood abnormalities, complaints of marginal sleep, need for breaks to listen to music/read/play with a pet dog in between chores, and the medication adjustments NP Connery made.

Respectfully, the functional implications of these facts is not apparent. Further, the fact that these observations were made in the same records in which NP Connery separately repeated the limitation concerning part time work with support, is not equivalent to NP Connery explaining what clinical findings support that limitation, which NP Connery did not do.

Further, Dr. Gresham's examination results including 1 out of 3 object recall, 3 digit recitation backward, inability to discuss current events, and inability to spell "world" backward are not necessarily "independent findings support[ing] the presence of limitations described by NP Connery Lee" as Plaintiff contends.   Again, Dr. Gresham is the only clinician who provided a detailed assessment about the functional implications of the examination he rendered, and importantly identified no more than mild functional limitations in any area.

In sum, the ALJ's characterization of the mental status findings as "grossly normal" was perhaps an overstatement.   But the finding was stronger than necessary to sustain the ALJ's decision.   The mental status exams reflect a combination of normal and abnormal findings.   Where the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.   *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997).

### e.    Neurosurgical Consultation

Plaintiff further explains that "[t]he ALJ did observe that neurosurgical consultation and hospitalization ruled out a physical cause for confusion"[7] . . . [But] That observation does not rule out a mental disorder causing greater impairment than the ALJ assessed."   Br. at 8.

The point, although otherwise reasonably well taken, somewhat mischaracterizes the legal inquiry.   The burden is upon Plaintiff to establish disability,[8] and the standard of review is whether the ALJ's reasoning for the non-disability finding (and each subsidiary conclusion within that framework, such as the mental RFC) is supported by substantial evidence.   Not whether the ALJ has ruled out the possibility that the claimant's mental limitations were more significant than the ALJ assessed.

### f.    Whether the RFC Sufficiently Incorporated The ALJ's

---

[7] A benign brain tumor.   AR 29 (citing Ex. B2F; B5F/18).
[8] *See Ukolov v. Barnhart*, 420 F.3d 1002, 1005 (9th Cir. 2005) (claimant has initial burden of proving a disability).

18

**<u>Own Findings of Moderate Limitations as to</u>**
**<u>Concentration, Persistence and Pace</u>**

Plaintiff further emphasizes the ALJ's rejection of the prior administrative findings of Dr. Solomon and Dr. Morgan as to only mild limitations in concentration/persistence/pace. AR 30.  The ALJ specifically found the non-examining doctors' assessments did not adequately account for Plaintiff's alleged confusion and memory problems, and the examination findings noting Plaintiff "recalled one-out-of-three items after a delay." *Id.*

Indeed, when performing the "special technique" for evaluation of mental impairments, also known as the "psychiatric review technique" or PRT, [9] the ALJ uniquely found that Plaintiff had a moderate limitation in concentration, persistence, and pace (in contrast to the mild limitation assessed by Drs. Solomon and Morgan).

The existence of two marked limitations, or one extreme limitation, satisfies listing 12.15 and is per se disabling, whereas an impairment causing no more than mild limitations in any area is generally considered a non-severe impairment. 20 C.F.R. § 416.920a(d)(1).

Moderate limitations lie somewhere in the middle of that spectrum and occupy a somewhat unique space in social security jurisprudence, with no controlling authority directly on point. "SSA defines a 'moderate' limitation to mean '[t]here is more than a slight limitation in this area, but the individual can still function satisfactorily.'"  *Rose M. E. v. Saul*, 2021 WL 1612091, at *3 (C.D. Cal. Apr. 26, 2021) (citing HALLEX (Hearings Appeals and Litigation Law Manual) I-2-5-20,

---

[9] Where the claimant alleges a mental impairment, Steps Two and Three require the ALJ to apply a "special technique," outlined in 20 C.F.R. §§ 404.1520a, 416.920a, to determine the severity of the claimant's impairment at Step Two, and to determine whether the impairment satisfies Social Security regulations at Step Three.  If the claimant is found to have a "medically determinable mental impairment," the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)," then "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of [Sections 404.1520a, 416.920a]," which specifies four broad functional areas: (1) understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. §§ 404.1520a(b), (c)(3); id. §§ 416.920a(b), (c)(3);. The functional limitations are rated on a five-point scale of "[n]one, mild, moderate, marked, [or] extreme," 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4).  If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the record, the claimant's RFC.  The RFC determination is thus distinct from the PRT (and consideration of the "four broad functional" areas) though the discussion often overlaps.

referencing Form HA-1152-U3 (Medical Source Statement).

Some courts have noted that "[m]oderate mental functional limitations . . . are not per se disabling, nor do they preclude the performance of jobs that involve simple, repetitive tasks"). *See, e.g.*, *McLain v. Astrue*, 2011 WL 2174895, *6 (C.D. Cal. 2011).

Even though moderate limitations are not per se disabling, some courts have found they must be incorporated in the RFC.  *See, e.g. Wascovich v. Saul*, 2:18-CV-659-EFB, 2019 WL 4572084, at *4 (E.D. Cal. Sept. 20, 2019) ("Where the ALJ accepts the medical assessment of moderate limitations, those limitations must be accounted for in the RFC."); (citing *Betts v. Colvin*, 531 F. App'x 799, 800 (9th Cir. 2013).

Here, at step two the ALJ found a moderate limitation in 1 of the 4 broad functional areas considered in the PRT, namely concentration/persistence/pace.  Subsequently, the ALJ formulated the RFC which restricted Plaintiff to "routine, repetitive tasks and simple decision making."   The question is whether this adequately incorporated the moderate concentration limitations.

Courts have occasionally relied on the Ninth Circuit's opinion in *Stubbs-Danielson* for the proposition that a limitation to simple and routine tasks can serve as a catchall for moderate mental limitations insofar as *Stubbs* held that an ALJ appropriately translated concentration limitations into "the only concrete restrictions available to him," namely a limitation to simple tasks.  *Stubbs–Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008).

The case law in this circuit is split but marginally favors the view that a restriction to simple/routine tasks is not a catchall for all moderate limitations in mental functioning.[10]

---

[10] *See Macias v. Saul,* No. 1:19-CV-01187-BAM, 2021 WL 856423, at *6 (E.D. Cal. Mar. 8, 2021) (collecting cases, and holding that a limitation to simple/routine tasks does not account for moderate limitations in maintain attendance and completing an 8-hour workday); (*Wascovich*, 2019 WL 4572084 at *5 (E.D. Cal. Sept. 20, 2019) (simple and routine task limitation does not account for moderate limitations in maintaining attendance); *Donna M. v. Saul*, No. 19-CV-03134-DMR, 2020 WL 6415601, at *4 (N.D. Cal. Nov. 2, 2020) (noting limitation to simple, routine tasks with no public interaction in RFC failed to address other moderate limitations, such as plaintiff's ability to relate to and interact with coworkers, associate with day-to-day work activity, maintain regular attendance in the workplace, and

Although a restriction to simple and routine/repetitive tasks may not be a catchall, it certainly has some logical relationship to concentration issues. Simple tasks require less concentration than complex tasks. Repetitive tasks (such as the conveyor line work identified by the VE here) require less concentration than tasks which vary hour to hour, day to day.

Further, the post-*Stubbs Danielson* caselaw provides no clear answer as to whether a restriction to simple and routine tasks (or similar language used here) accounts for moderate limitations in concentration, persistence, and pace. And, if not, there is similarly no clear guidance on how such a limitation ought to be incorporated in the RFC in concrete terms[11] that might conceivably impact the Vocational Expert's answer as to what jobs a hypothetical individual with such restrictions could perform.[12] As such, there is simply no basis to grant the claimant relief here absent a statement by any treating, examining, or non-examining source that Plaintiff has more than moderate limitations in any category of functioning.

### B.    Plaintiff's Testimony

#### 1.    Applicable Law

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). A claimant's

---

perform work activities on a consistent basis without special or additional supervision); *Sahyoun v. Saul*, No. 2:18-CV-576-EFB, 2020 WL 1492661, at *4 (E.D. Cal. Mar. 27, 2020) (rejecting argument that RFC determination that plaintiff could sustain work involving simple, repetitive tasks adequately captured moderate limitations in maintaining regular attendance, completing a normal workday or work week without interruption from a psychiatric condition, and handling normal work-related stress); *Christopher G. v. Saul*, No. 2:19-CV-06150-AFM, 2020 WL 2079972, at *6 (C.D. Cal. Apr. 30, 2020); *Flores v. Saul*, No. 1:18-CV-01523-SKO, 2020 WL 509098, at *5 (E.D. Cal. Jan. 31, 2020); but see *Messerli v. Berryhill*, No. 1:16–cv–00800–SKO, 2017 WL 3782986, at *11 (E.D. Cal. Aug. 31, 2017) (finding limitation to "simple repetitive tasks" accounted for moderate limitations in ability to accept instructions, interact with coworkers and the public, maintain attendance, complete a normal workday/workweek without interruptions, and moderate to serious limitations in her ability to deal with work stress); Calisti v. Colvin, 2015 WL 7428724, at * 7 (E.D. Cal. Nov. 23, 2015); *Schmidt v. Colvin*, No. 2:12-cv-00016-KJN, 2013 WL 5372845, at *17 (E.D. Cal. Sept. 25, 2013).

[11] Compared to the PRT area for interacting with others, which can be readily translated in concrete terms in the familiar RFC restrictions limiting the frequency of contact with co-workers, supervisors, and the general public.

[12] Although POMS gives some example (https://secure.ssa.gov/poms.nsf/lnx/0425020010s), there is a dearth of caselaw adopting them as necessary, concrete, or impactful components of the mental RFC.

statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability.  42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p.

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen*, 80 F.3d at 1281; S.S.R 16-3p at 3.  First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281–82.  If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities."  S.S.R. 16-3p at 2.

An ALJ's evaluation of a claimant's testimony must be supported by specific, clear and convincing reasons.  *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *see also* S.S.R. 16-3p at *10.  Subjective testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining the severity of claimant's pain and its disabling effects."  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).

## 2.   **Analysis**

Plaintiff's discussion is susceptible to the same criticism directed at the ALJ, namely that Plaintiff offers little to no discussion as to what testimony specifically should have been credited as true, what evidence would support it, and what RFC restrictions would logically follow in addition to, or in lieu of, the restrictions the ALJ already included in the RFC.

Plaintiff borrowed from the ALJ's description of the testimony: "The ALJ noted that Schilling described herself as having a poor memory, able to concentrate for five minutes, did not follow instructions well, had difficulty with her memory, completing tasks, concentrating,

understanding, and following instructions." Br. at 10, Doc. 16 (citing AR 27).

With the exception of Plaintiff's alleged five-minute maximum attention span, the remaining testimony offered generalized statements that work activity is difficult and symptom inducing. These statements need not be (and likely cannot be) concretely incorporated into the RFC. The RFC is not a representation of the most one can do while remaining symptom free, it is a representation of "the most you can do despite your limitations." 20 C.F.R. 416.945(a)(1).

As to the inability to concentrate beyond five minutes, the testimony is not entirely consistent with the mixed evidence upon mental status examination and Dr. Gresham's opinion that Plaintiff had only mild concentration limitations. Plaintiff breaks no new ground on the discussion already addressed above. Rather, Plaintiff's discussion is copied and pasted from the argument on the first issue likewise addressed in detail above.

If the hearing testimony addressed novel issues not already addressed elsewhere by the ALJ, it was Plaintiff's burden to explain as much. There is no basis to conclude the ALJ committed error by failing to adequately address or incorporate the alleged limitations reflected in the claimant's testimony such as poor concentration, which was already a primary focus of discussion.

**VII.  Conclusion and Order**

For the reasons stated above, the Court finds that substantial evidence and applicable law support the ALJ's conclusion that Plaintiff was not disabled. Accordingly, Plaintiff's appeal from the administrative decision of the Commissioner of Social Security is denied. The Clerk of Court is directed to enter judgment in favor of Defendant and against Plaintiff April Rachel Schilling.

IT IS SO ORDERED

Dated:   **January 22, 2024**                         **/s/ Gary S. Austin**
                                          UNITED STATES MAGISTRATE JUDGE